## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| TRACY DOWD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    1:18CV640 |
| | ) |
| ANDREW M. SAUL, | ) |
| Commissioner of Social | ) |
| Security,[1] | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM OPINION AND RECOMMENDATION
### OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Tracy Dowd, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security, denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). (Docket Entry 2.) Defendant has filed the certified administrative record (Docket Entry 6 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 8, 10; see also Docket Entry 9 (Plaintiff's Brief); Docket Entry 11 (Defendant's Memorandum)). For the reasons that follow, the Court should enter judgment for Defendant.

---

[1] The United States Senate confirmed Andrew M. Saul as the Commissioner of Social Security on June 4, 2019, and he took the oath of office on June 17, 2019. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul is substituted for Nancy A. Berryhill as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

# I. PROCEDURAL HISTORY

Plaintiff filed an application for DIB on October 23, 2014, alleging a disability onset date of September 14, 2013. (See Tr. 278.) Plaintiff later amended his alleged disability onset date to October 29, 2014. (Tr. 282.) Upon denial of that application initially (Tr. 114-27) and on reconsideration (Tr. 129-45), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 188). Plaintiff, his attorney, and a vocational expert ("VE") attended the hearing. (Tr. 40-91.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 21-35.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-5), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that decision, the ALJ made the following findings:

> 1. [Plaintiff] last met the insured status requirements of the . . . Act on December 31, 2017.
>
> 2. [Plaintiff] did not engage in substantial gainful activity during the period from his alleged onset date of October 29, 2014, through his date last insured of December 31, 2017.
>
> . . .
>
> 3. Through the date last insured, [Plaintiff] had the following severe impairments: history of motor vehicle accident with cervical spine and right scapula fractures and traumatic brain injury (TBI); denervation/left brachial plexus (C5-T1); left acromioclavicular (AC)

2

joint osseus fusion; depressive disorder; and post-traumatic stress disorder (PTSD).

. . .

4. Through the date last insured, [Plaintiff] did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5. . . . [T]hrough the date last insured, [Plaintiff] had the residual functional capacity to perform sedentary work . . . with the following additional limitations: push/pull limited to the sedentary level; no use of foot controls; no climbing of ladders, ropes, or scaffolds; no more than occasional climbing of ramps or stairs, balancing, stooping, crouching, kneeling, or crawling; as to the non-dominant left upper extremity-no reaching, handling, fingering, or feeling; and no exposure to excessive vibration, or to workplace hazards (such as moving machinery and unprotected heights). Further, work was limited to simple, routine, and repetitive tasks, in a low-stress job (defined as having no more than occasional decision-making required and no more than occasional changes in the work setting); no production rate or paced work (such as would be done on an assembly line); no interaction with the general public; no more than occasional interaction with coworkers, and such interaction was further limited to superficial interaction (such as a brief greeting or a brief exchange of information) and/or interaction that was incidental to the work being performed; and no tandem tasks.

. . .

6. Through the date last insured, [Plaintiff] was unable to perform any past relevant work.

. . .

10. Through the date last insured, considering [Plaintiff's] age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that [Plaintiff] could have performed.

3

. . .

> 11.  [Plaintiff] was not under a disability, as defined in the . . . Act, at any time from October 29, 2014, the alleged onset date, through December 31, 2017, the date last insured.

(Tr. 24-34 (internal parenthetical citations omitted).)

## II.  DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." <u>Hines v. Barnhart</u>, 453 F.3d 559, 561 (4th Cir. 2006).  However, "the scope of . . . review of [such a] decision . . . is extremely limited." <u>Frady v. Harris</u>, 646 F.2d 143, 144 (4th Cir. 1981).  Plaintiff has not established entitlement to relief under the extremely limited review standard.

## A.  Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).  Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." <u>Hines</u>, 453 F.3d at 561 (internal brackets and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Hunter v. Sullivan</u>, 993 F.2d 31, 34 (4th Cir. 1992) (quoting

4

<u>Richardson v. Perales</u>, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." <u>Hunter</u>, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Social Security Commissioner]." <u>Mastro</u>, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Social Security Commissioner] (or the ALJ)." <u>Id.</u> at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981),

5

and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . promulgated . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity

---

[2] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

to (4) perform [the claimant's] past work or (5) any other work."
Albright v. Commissioner of Soc. Sec. Admin., 174 F.3d 473, 475 n.2
(4th Cir. 1999).[3]  A finding adverse to the claimant at any of
several points in the SEP forecloses an award and ends the inquiry.
For example, "[t]he first step determines whether the claimant is
engaged in 'substantial gainful activity.' If the claimant is
working, benefits are denied.  The second step determines if the
claimant is 'severely' disabled.  If not, benefits are denied."
Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at
each of the first three steps, "the claimant is disabled." Mastro,
270 F.3d at 177.  Alternatively, if a claimant clears steps one and
two, but falters at step three, i.e., "[i]f a claimant's impairment
is not sufficiently severe to equal or exceed a listed impairment,
the ALJ must assess the claimant's residual functional capacity
('RFC')." Id. at 179.[4]  Step four then requires the ALJ to assess

_____

[3] "Through the fourth step, the burden of production and proof is on the
claimant.  If the claimant reaches step five, the burden shifts to the
[government] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

[4] "RFC is a measurement of the most a claimant can do despite [the
claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative
regulations require RFC to reflect claimant's "ability to do sustained work-
related physical and mental activities in a work setting on a regular and
continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an
equivalent work schedule" (internal emphasis and quotation marks omitted)).  The
RFC includes both a "physical exertional or strength limitation" that assesses
the claimant's "ability to do sedentary, light, medium, heavy, or very heavy
work," as well as "nonexertional limitations (mental, sensory, or skin
impairments)." Hall, 658 F.2d at 265.  "RFC is to be determined by the ALJ only
after [the ALJ] considers all relevant evidence of a claimant's impairments and
any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[5]

## B.  Assignments of Error

Plaintiff contends that the Court should overturn the ALJ's finding of no disability on these grounds:

(1) "[t]he ALJ erred by finding that [Plaintiff] is able to perform the work of a Small Parts Sorter, a Surveillance Monitor, and a Laminator" (Docket Entry 9 at 3 (italics and single-spacing omitted));

---

[5] A claimant thus can qualify as disabled via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

8

(2) "[t]he ALJ erred by failing to appropriately consider the prior [Department of Veterans Affairs ('VA')] determination that [Plaintiff] is disabled" (id. at 7 (italics and single-spacing omitted));

(3) "[t]he ALJ erred by failing to account for all of [Plaintiff's] severe impairments" (id. at 8 (italics and single-spacing omitted)); and

(4) "[t]he ALJ erred by his selective use of the evidence regarding [Plaintiff's] pain; by failing to account for the effect of [Plaintiff's] pain on his ability to concentrate and maintain attention; and by failing to account for all of [Plaintiff's] impairments in the RFC" (id. at 9 (italics and single-spacing omitted)).

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (See Docket Entry 11 at 3-24.)

### 1. Conflicts Between VE's Testimony and DOT

Plaintiff's first assignment of error contends that "[t]he ALJ erred by finding that [Plaintiff] is able to perform the work of a Small Parts Sorter, a Surveillance Monitor, and a Laminator." (Docket Entry 9 at 3 (italics and single-spacing omitted).) According to Plaintiff, the DOT's descriptions of the three jobs in question all reflect duties and/or workplace conditions that conflict with the VE's testimony that an individual with Plaintiff's RFC could perform those jobs (see Tr. 86-87). (See

9

Docket Entry 9 at 3-6.)  Those contentions ultimately fail to carry the day.

Social Security Ruling 00-4p, _Policy Interpretation Ruling: Titles II and XVI: Use of Vocational Expert and Vocational Specialist Evidence, and Other Reliable Occupational Information in Disability Decisions_, 2000 WL 1898704 (Dec. 4, 2000) ("SSR 00-4p"), places an affirmative duty on an ALJ to elicit an explanation from the VE as to any "apparent unresolved conflict" between the VE's testimony and the DOT:

> Occupational evidence provided by a VE . . . generally should be consistent with the occupational information supplied by the [DOT].  When there is an _apparent unresolved conflict_ between VE . . . evidence and the [DOT], the [ALJ] must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled.  At the hearings level, as part of the [ALJ's] duty to fully develop the record, the [ALJ] will inquire, on the record, as to whether or not there is such consistency.

SSR 00-4p, 2000 WL 1898704, at *2 (emphasis added).  "[A]n ALJ has not fulfilled his affirmative duty merely because the [VE] responds 'yes' when asked if her testimony is consistent with the [DOT]," _Pearson v. Colvin_, 810 F.3d 204, 208 (4th Cir. 2015) (internal quotation marks omitted); thus, "[t]he ALJ _independently_ must identify . . . where the [VE's] testimony seems to, but does not necessarily, conflict with the [DOT]," _id._ at 209 (emphasis added); _see also id._ (rejecting the Commissioner's argument that an "apparent" conflict meant only an "obvious" one).

10

Here, the following exchange took place between the ALJ and the VE:

[ALJ:]    . . . [L]et's start off by assuming a person the same age, education, and work experience as [Plaintiff].  Let's say that that person retains the ability to perform work at the light exertional level with push or pull limited to the light level with no use of foot controls, with no climbing of ladders, ropes or scaffolds; no more than occasional climbing of ramps or stairs, balancing, stooping, crouching, kneeling or crawling, with no use of the nondominant upper extremity.  So no reaching, handling, fingering or feeling. With no exposure to workplace hazards, such as moving machinery or unprotected heights.  And with no exposure to excessive vibration.  In addition, let's say that this hypothetical person is limited to the performance of simple, routine, repetitive tasks [("SRRTs")] in a low stress job, which I'll define as having no more than occasional decision-making required and no more than occasional changes in the work setting.  With no production rate or paced work, such as would be done on an assembly line.   No interaction with the general public.  With no more than occasional interaction with co-workers and that interaction would be further limited to superficial interactions, such as a brief greeting or a brief exchange of information, and or interaction that would be incidental to the work that was being performed, with no tandem tasks.  The skill level called for in the hypothetical, alone, would, I believe preclude the past work.  Is that correct?

[VE:]    Yes.

[ALJ:]    So would there be examples of other jobs that would fit within that hypothetical?

[VE:]    Not at the light level.

11

> [ALJ:] And what's the preclusive factor at the light level?
>
> [VE:] No use of the nondominant hand and in combination with no production, no public or tandem work. Combination of all of it.
>
> [ALJ:] And what about at the sedentary exertional level?
>
> [VE:] Yes. There would be – I can give you sedentary. . . .
>
> The first position is [S]mall [P]arts [S]orter, [DOT] code 521.687-086, sedentary, [Specific Vocational Preparation [('SVP')] 2. National number, 102,400. The next position is a [S]urveillance [M]onitor, [DOT] code 379.367-010, sedentary, SVP 2. National number, 98,600. And a third position is a [L]aminator, [DOT] code 690.685-258, sedentary, SVP 2. National number, 95,200.

(Tr. 86-87.) Following cross-examination of the VE by Plaintiff's attorney, the ALJ inquired if the VE's testimony harmonized with the DOT, to which the VE responded affirmatively and then clarified that, as to "items that aren't addressed in the [DOT], such as . . . interaction," she based her testimony on her "education, training, and experience." (Tr. 90.)

The ALJ subsequently adopted the VE's testimony as to Plaintiff's ability to perform the three jobs in question:

> To determine the extent to which [the RFC's non-exertional] limitations erode the unskilled sedentary occupational base, through the date last insured, the [ALJ] asked the [VE] whether jobs existed in the national economy for an individual with [Plaintiff's] age, education, work experience, and [RFC]. The [VE] testified that, given all of these factors[,] the

12

individual would have been able to perform the
requirements of representative occupations such as:

> Pursuant to SSR 00-4p, the [ALJ] ha[s] determined that
> the [VE's] testimony is consistent with the information
> contained in the [DOT]. However, the VE testified that,
> as to any factors not specifically addressed by the [DOT]
> (such as social interaction, sit/stand option, etc.),
> [s]he relied upon h[er] education and experience. [The
> ALJ] find[s] the VE provided a reasonable explanation for
> any potential discrepancies between h[er] testimony and
> the information contained in the [DOT].

> Based on the testimony of the [VE], the [ALJ] concludes
> that, considering [Plaintiff's] age, education, work
> experience, and [RFC], [Plaintiff] was capable of making
> a successful adjustment to other work that existed in
> significant numbers in the national economy.

(Tr. 33-34 (emphasis added).) Plaintiff nevertheless contends that

conflicts between the VE's testimony and the DOT exist concerning

all three of the cited jobs. (See Docket Entry 9 at 3-6.)

Plaintiff first maintains that, because the Small Parts Sorter

job "requires the worker to remove defective product and foreign

matter from a conveyor belt within a time constraint," that job

conflicts with the RFC's limitation to "no production rate or paced

work (such as would be done on an assembly line)." (Id. at 3

(citing Tr. 29 and referencing DOT, No. 521.687-086 (Nut Sorter),

1991 WL 674226 (G.P.O. 4th ed. rev. 1991)).)[6] Plaintiff points to

a recent case from a neighboring district court, where "the court

---

[6] The DOT reflects the title of "Nut Sorter" for the job the VE called
"Small Parts Sorter." DOT, No. 521.687-086 (Nut Sorter), 1991 WL 674226. For
ease of reading, this Recommendation will refer to the job as "Small Parts
Sorter."

13

reversed because the [Small Parts Sorter] job required the worker to 'remove defective product and foreign matter from a conveyor belt within a time constraint,' thus exceeding the claimant's RFC, which precluded production work." (Id. at 3-4 (quoting Coleman v. Berryhill, No. 1:16CV3465, 2018 1417524, at *5 (D.S.C. Mar. 22, 2018) (unpublished), and also citing Lewis v. Colvin, No. 7:13CV59, 2014 WL 4205834, at *12 (E.D.N.C. Aug. 5, 2014) (unpublished), recommendation adopted, 2014 WL 4205994 (E.D.N.C. Aug. 25, 2014) (unpublished)).)  According to Plaintiff, because "no principled distinction [exists] between *Coleman* and *Lewis* and this case[, ] the ALJ erred by finding that [Plaintiff] can work as a Small Parts Sorter." (Id. at 4.)

Although the undersigned has not located any authority on this issue from the United States Court of Appeals for the Fourth Circuit, multiple district courts within the Fourth Circuit have held that the DOT's description of a job as involving work with a conveyor belt conflicts with a VE's testimony that an individual who must avoid production rate or paced work could perform the job in question.  However, in each of those cases, the VE failed to provide a reasonable explanation resolving the conflict.  For example, in Coleman, the court emphasized that it "d[id] not intend to create a per se rule regarding the classification of the [Small Parts Sorter job]," but that, "considering the totality of the circumstances, including the unaddressed conflicts . . ., [the

14

plaintiff's case] require[d] additional vocational input to cure the confusion surrounding the situation." Coleman, 2018 WL 1417524, at *5. Similarly, in Lewis, the court held that the DOT's description of the Lens Inserter job as involving placing eyeglass frames on a conveyor belt "appear[ed] to entail production-pace work . . . in the absence of an explanation" from the VE. Lewis, 2014 WL 4205834, at *12; see also Robert M. v. Saul, Civ. No. 19-345, 2020 WL 1046046, at *3 (D. Md. Mar. 4, 2020) (unpublished) (holding that "task of looking at items on a conveyor belt and removing specific items conflicts with an RFC precluding fast paced, assembly line work" and rejecting Commissioner's argument that VE had adequately resolved conflict); Morrison v. Berryhill, No. 2:18CV116, 2019 WL 2413314, at *8 (N.D. W. Va. May 23, 2019) (unpublished) (finding that DOT description of Sorter job as involving conveyor belt "would appear to conflict with [the p]laintiff's RFC which contains no rapid pace or strict production quotas" and that VE's testimony inadequately resolved that conflict), recommendation adopted, 2019 WL 2411434 (N.D. W. Va. Jun. 7, 2019) (unpublished); Martinez v. Berryhill, No. 3:17CV186, 2018 WL 709971, at *4 (W.D.N.C. Feb. 5, 2018) (unpublished) ("The Court agrees that an apparent conflict, albeit a tenuous one, exists between the job of [L]ens [I]nserter, which requires [the] plaintiff to work by placing materials on a conveyor belt, and the hypothetical presented to the VE that [the] plaintiff not work at

15

a production-rate pace."), aff'd sub nom., Martinez v. Saul, 776 F. App'x 175 (4th Cir. 2019).

On the other hand, other judges of this Court have rejected a plaintiff's argument that the mere presence of the word "conveyor" in a DOT job description creates an apparent conflict under Pearson. See Karriker v. Berryhill, No. 1:16CV21, 2017 WL 722012, at *7 (M.D.N.C. Feb. 23, 2017) (unpublished) (Peake, M.J.), recommendation adopted, slip op. (M.D.N.C. Mar. 17, 2017) (Schroeder, J.). In Karriker, the Court first noted the definition of light work in Appendix C of the DOT, which provides "that a job should be rated as 'light work' when it requires working at a production rate pace," thus implying that no sedentary jobs can involve a "production rate pace" as defined by the DOT.[7] The Court in Karriker ultimately held that the Table Worker and Sorter positions did not conflict with a hypothetical question precluding production pace because the DOT classifies those jobs as sedentary. Like Karriker, the Commissioner here asserts that "the VE testified that[,] because th[e Small Parts Sorter] job is sedentary, and not light, in nature, there was no conflict." (Docket Entry 11 at 8

---

[7] The pertinent portion of that definition reads as follows: "[A] job should be rated [l]ight [w]ork . . . when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible. NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible." DOT, App'x C ("Components of the Definition Trailer"), § IV ("Physical Demands - Strength Rating"), 1991 WL 688702.

16

(citing Tr. 87 (containing VE's testimony that hypothetical question's restriction of "use of the nondominant hand [] in combination with <u>no production</u>, no public or tandem work" precluded any available light jobs (emphasis added))).)

Still other cases exist where the court has simply not found a sufficient conflict under <u>Pearson</u> and/or SSR 00-4p between mentions of a "conveyor" in the <u>DOT</u> and the VE's testimony that a claimant precluded from production work could still perform the job in question. <u>See, e.g.,</u> <u>Griffin v. Commissioner, Soc. Sec. Admin.</u>, No. 2:17CV644, 2018 WL 4519339, at *8 (D.S.C. July 2, 2018) (unpublished) ("[A]lthough [the p]laintiff appears to equate tasks involving a conveyor belt with fast-paced production requirements, courts have held otherwise." (citing <u>Garcia v. Colvin</u>, No. EDCV 15-1369, 2016 WL 3268861, *3 (C.D. Cal. Jun. 62016) (unpublished))), <u>recommendation adopted sub nom.</u>, <u>Griffin v. Berryhill</u>, 2018 WL 3912949 (D.S.C. Aug. 16, 2018) (unpublished); <u>Anderson v. Commissioner of Soc. Sec.</u>, No. 2:14CV1840, 2015 WL 6468186, at *4 (S.D. Ohio Oct. 27, 2015) (unpublished) ("The inference [the p]laintiff draws – that [the Table Worker position] must be [] a [fast-paced production] job due to the reference to a conveyor – is too weak to establish the kind of direct conflict which, absent any other information, would likely require a remand."), <u>recommendation adopted</u>, 2015 WL 7278585 (S.D. Ohio Nov. 18, 2015) (unpublished).

17

The Court need not determine whether an apparent conflict existed between the DOT's description of the Small Parts Sorter job and the VE's testimony that an individual precluded from production rate or paced work could perform that job because, to the extent such an apparent conflict even existed, Plaintiff has not shown that the ALJ failed to resolve that conflict. As SSR 00-4p expressly recognizes, "[t]he [DOT] lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings," and "[the] VE . . . may be able to provide more specific information about jobs or occupations than the [DOT]." SSR 00-4p, 2000 WL 1898704, at *3 (emphasis added).

Here, the VE provided that specialized information and opined that the Small Parts Sorter job, as she had observed it, involved an "individual [with] a tray of small items [such as] eyeglass parts," and the individual must "sort [the parts] out into other trays[ or s]eparate them out." (Tr. 88.)[8] That testimony makes clear that the Small Parts Sorter job intended by the VE does not involve production rate or paced work. The ALJ's later reliance upon that testimony at step five of the SEP (see Tr. 33-34), including his express statement that "the VE provided a reasonable explanation for any potential discrepancies between h[er] testimony

_____

[8] The VE also confirmed that an individual could perform the Small Parts Sorter job with one hand. (See Tr. 88.)

18

and the information contained in the [DOT] (Tr. 34), resolved any apparent conflict that might have existed, see Danielle Charlotte L. v. Commissioner of Soc. Sec., No. 1:18CV166, 2019 WL 1460879, at *9 (E.D. Wash. Apr. 2, 2019) (unpublished) ("Even if there had been an apparent conflict, the [VE] testified based on her professional experience, stating that her testimony about each identified job was based on her experience in assisting and observing individuals, actually doing this job." (internal quotation marks, brackets, and citation omitted)).

Furthermore, although Plaintiff argues that the ALJ failed to identify and resolve apparent conflicts between the DOT and the VE's testimony with regard to the Surveillance Monitor and Laminator jobs (see Docket Entry 9 at 4-6), any such errors by the ALJ remain harmless under the circumstances of this case, see generally Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"). As discussed above, Plaintiff has not shown that apparent, unresolved conflicts existed with respect to the Small Parts Sorter job, and the VE testified that 102,400 such jobs existed in the national economy (see Tr. 87), which constituted a significant number of jobs, see Hicks v. Califano, 600 F.2d 1048, 1051 (4th Cir. 1979) ("[The c]laimant contends that the light and

19

sedentary jobs described by the [VE] . . . do not exist in
significant numbers within the region. We do not think that the
approximately 110 jobs testified to by the [VE] constitute an
insignificant number."). The ALJ thus met his step five burden.
See Lippincott v. Commissioner of Soc. Sec., 982 F. Supp. 2d 358,
384 (D.N.J. 2013) ("[T]he ALJ need only identify a single job
within the claimant's capacity that exists in significant numbers
in the national economy.").

    In short, Plaintiff's first assignment of error demonstrates
no basis for reversal or remand.

### 2. VA Disability Rating

    In Plaintiff's second issue on review, he argues that the ALJ
"erred by failing to appropriately consider the prior VA
determination that [Plaintiff] is disabled." (Docket Entry 9 at 7
(italics and single-spacing omitted) (referencing Tr. 308-30).) In
particular, Plaintiff maintains that, "although VA disability
ratings are not binding on the ALJ, the ALJ must give the VA's
findings 'substantial weight' unless the record 'clearly
demonstrates' that they are entitled to less weight." (Id.
(quoting Bird v. Commissioner of Soc. Sec., 699 F.3d 337, 343 (4th
Cir. 2012)).) Plaintiff further argues that the ALJ "did not apply
the required presumption that the VA's rating be given substantial
weight." (Id. (citing Reece v. Colvin, No. 1:13CV924, 2014 WL
2117034, at *4 (M.D.N.C. May 21, 2014) (unpublished) (Schroeder,

J.)).) According to Plaintiff, "the ALJ's own language . . . makes clear that he did not" give the VA determination the deference due to it under <u>Bird</u>. (<u>Id.</u> at 7-8 (citing Tr. 32).) Finally, Plaintiff asserts that judges of this Court have expressly disapproved of the language that the ALJ used to discount the VA determination. (<u>Id.</u> at 8 (citing <u>Comer v. Colvin</u>, No. 1:16CV199, 2016 WL 7176602, at *3 (M.D.N.C. Dec. 8, 2016) (unpublished) (Webster, M.J.), <u>recommendation adopted</u>, slip op. (M.D.N.C. Jan. 4, 2017) (Eagles, J.)).) Plaintiff's contentions fall short.

The VA found Plaintiff 80 percent disabled effective December 8, 2012. (Tr. 317.) Effective February 3, 2016, the VA increased Plaintiff's combined disability percentage to 90 percent, and, effective July 8, 2016, increased Plaintiff's rating to 100 percent disabled. (<u>Id.</u>) The record reflects that Plaintiff's service-connected disabling conditions included the following:

- right hip osteoarthritis - 10 percent (Tr. 309);

- post traumatic headaches - 30 percent (Tr. 310);

- left shoulder strain - 20 percent (Tr. 310-11);

- left knee instability - 20 percent (Tr. 311);

- right shoulder strain with bone island - 20 percent (Tr. 311); and

- posttraumatic stress disorder (PTSD) with traumatic brain injury (TBI) - 70 percent (Tr. 312.).

21

In _Bird_, the Fourth Circuit addressed for the first time the "weight that the SSA must afford to a VA disability rating." _Bird_, 699 F.3d at 343. The court observed the similarities between the evaluation of disability by the VA and the SSA:

> [B]oth the VA and Social Security programs serve the same governmental purpose of providing benefits to persons unable to work because of a serious disability. "Both programs evaluate a claimant's ability to perform full-time work in the national economy on a sustained and continuing basis; both focus on analyzing a claimant's functional limitations; and both require claimants to present extensive medical documentation in support of their claims."

_Id._ (quoting _McCartey v. Massanari_, 298 F.3d 1072, 1076 (9th Cir. 2002)) (internal citation omitted).

After reviewing the "varying degrees of evidentiary significance" other circuits afford VA disability ratings, the Fourth Circuit held as follows:

> The VA rating decision reached in [the plaintiff's] case resulted from an evaluation of the same condition and the same underlying evidence that was relevant to the decision facing the SSA. Like the VA, the SSA was required to undertake a comprehensive evaluation of [the plaintiff's] medical condition. Because the purpose and evaluation methodology of both programs are closely related, a disability rating by one of the two agencies is highly relevant to the disability determination of the other agency. Thus, we hold that, in making a disability determination, the SSA must give substantial weight to a VA disability rating. However, because the SSA employs its own standards for evaluating a claimant's alleged disability, and because the effective date of coverage for a claimant's disability under the two programs likely will vary, an ALJ may give less weight to a VA disability rating when the record before the ALJ clearly demonstrates that such a deviation is appropriate.

Bird, 699 F.3d at 343 (emphasis added).  Following Bird, the Fourth Circuit further clarified "what an ALJ must do" to clearly demonstrate the appropriateness of a deviation from Bird's substantial weight standard:

> We now conclude, consistent with our sister circuits, that in order to demonstrate that it is "appropriate" to accord less than "substantial weight" to a[ ] disability decision, an ALJ must give "persuasive, specific, valid reasons for doing so that are supported by the record."

Woods v. Berryhill, 888 F.3d 686, 692 (4th Cir. 2018) (quoting McCartey, 298 F.3d at 1076) (emphasis added).

In this case, in evaluating the VA's disability rating, the ALJ first stated as follows:

> It is noted that [Plaintiff] has a current service-connected VA disability rating of 100 [percent].  Such rating is afforded limited weight.  Mainly, VA ratings are based upon standards not entirely relevant to a disability determination made by the SSA.  As discussed in this decision, the VA's own treatment notes do not soundly support a finding that [Plaintiff] is disabled physically or mentally; nor do those records show that he is unable to perform work within the parameters of the [RFC] (in accordance with SSA's regulatory framework, to support a finding of disability).

(Tr. 32 (emphasis added) (internal citations omitted).)  Here, the ALJ's consideration of Plaintiff's VA disability rating ultimately complies with Bird and Woods.

The ALJ's statement that, "[m]ainly, VA ratings are based upon standards not entirely relevant to a disability determination made by the SSA" (Tr. 32 (emphasis added)), disregards Bird's holding to the contrary that, "[b]ecause the purpose and evaluation

23

methodology of both programs are <u>closely related</u>, a disability rating by one of the two agencies is <u>highly relevant</u> to the disability determination of the other agency," <u>Bird</u>, 699 F.3d at 343 (emphasis added). Moreover, in <u>Woods</u>, the Fourth Circuit expressly rejected the ALJ's rationale for discounting a state agency Medicaid disability determination that the agency utilized different standards, noting that such a "generic explanation, which could apply to every [state agency Medicaid] decision, [wa]s neither persuasive nor specific." <u>Woods</u>, 888 F.3d at 693. Thus, the difference in methodology between the VA and the SSA, <u>standing alone</u>, does not permit the assignment of less than substantial weight to the VA's disability rating.

The ALJ, however, also found that "<u>the VA's own treatment notes do not soundly support a finding that the claimant is disabled physically or mentally</u>" (Tr. 32 (emphasis added)) and, elsewhere in the decision, detailed the record evidence, as well as some of Plaintiff's own statements to his medical providers, that weighed against a finding of disability (and thus contradicted the VA's finding of 100 percent disability):

> Treatment notes show that [Plaintiff] endorsed ongoing left upper extremity paralysis and pain since experiencing a motor vehicle accident in 2013 that resulted in fractures of the cervical spine (brachial plexus injury) and right scapula. Although [Plaintiff] successfully underwent surgical and conservative (*i.e.*, inpatient rehab, medications, bracing) treatments, he continued to complain of ongoing symptoms throughout the period of alleged disability. Yet, objective findings

24

were no more than mild to moderate in nature. Radiological tests demonstrated left nerve root avulsion at C7-T1 and T1-T2 with associated pseudomeningocele, mild degenerative cervical changes, and old and inferior displaced/nonunion fracture of the C6 spinous process with no acute fracture identified. Left shoulder images showed osseous fusion of the AC joint with diffuse osteopenia, muscle atrophy, and no evidence of acute fracture, dislocation, or rotator cuff tear/retraction. . . . He had no signs of acute distress; normal anterior cervical chain with full neck motion; no signs of extremity clubbing, cyanosis, or edema; full right upper extremity and bilateral lower extremity motion and strength; and well-healed surgical scars. [Plaintiff] had grossly intact cranial nerves; intact bilateral lower extremity and right upper extremity reflexes; normal gait and balance with intact tandem heel-to-toe walking; and negative Romberg signs. [Plaintiff] had no difficulty walking, getting on/off examination tables, taking shoes on/off; nor writing or signing medical documents. Actually, with medication use and left arm bracing alone, [Plaintiff] often denied any significant pain as well as medication side effects.

(Tr. 30 (internal citations omitted).)

The ALJ also said the following of Plaintiff's mental impairments:

Although [Plaintiff] periodically stopped medications on his own, and cancelled or failed to show up for therapy appointments on numerous occasions, his mental status was largely normal. Clinical observations frequently included no signs of acute distress or psychomotor abnormalities; intact alertness, orientation, associations, and thought processes/content; good memory and eye contact; fair to good abstract thinking, judgment, and insight; and euthymic, slightly anxious, and/or depressed moods with congruent affect. He had appropriate grooming, cooperative behaviors, normal speech, and no signs of significant cognitive impairment, response to internal stimuli, hallucinations, paranoid ideations, or suicidal/homicidal ideations. Moreover, providers specifically indicated that he showed no overt barriers to learning; he was a good historian with no significant difficulty recalling past and present events;

25

he showed no difficulty verbalizing thoughts, concerns, and/or problems appropriately; his thinking was easy to follow in conversations; and, he appeared to enjoy cognitive tasks. [Plaintiff] was able to consistently voice understanding of medical procedures and recommendations; independently make medical decisions; successfully implement cognitive strategies (that were reportedly effective and provided consistency); and easily establish rapport with providers. Also, he discussed with providers his pursuit of (and, at times, difficulty with) romantic relationship(s).

As of June 2017, [Plaintiff] denied any significant concerns with mental or cognitive symptoms. He endorsed better moods, focus, and ability to complete tasks with medication and therapy; and even requested to continue the same medications as prescribed because they were effective. He also denied medication side effects. It is further noted that he was discharged from speech-cognitive therapy because he demonstrated good understanding of, and improvement with, recommendations; and denied any concerns with memory and could not identify any additional cognitive needs. Accordingly, providers advised him to continue only on with outpatient individual therapy and medication management to maintain mental health stabilization.

(Tr. 31 (internal citations omitted).)

That analysis by the ALJ provided "persuasive, specific, valid reasons . . . supported by the record," Woods, 888 F.3d at 692, for declining to give substantial weight to the VA's disability rating. As in Comer, the ALJ used language inconsistent with Bird; however, after making that determination, the Court in Comer concluded that the ALJ in that case had cited substantial evidence from the record to support his decision. Comer, 2016 WL 7176602 at *4. Because, here, the ALJ has also cited substantial evidence to support his

26

determination, the Court should overrule Plaintiff's second assignment or error.

### 3. Severe Impairments Analysis

In his decision, the ALJ identified five severe impairments:

- history of motor vehicle accident with cervical spine and right scapula fractures and traumatic brain injury (TBI);

- denervation/left brachial plexus (C5-T1);

- left acromioclavicular (AC) joint osseus fusion;

- depressive disorder; and

- post-traumatic stress disorder.

(Tr. 26.) In his third issue on review, Plaintiff contends that the ALJ erred at step two of the SEP by failing to categorize his migraines as an additional severe impairment and at step five of the SEP by failing to consider that impairment in combination with his other impairments. (Docket Entry 9 at 8-9.) The Court should reject these arguments.

An impairment falls short of "severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1522(a). Applicable regulations further provide that "basic work activities" include:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

> (2) Capacities for seeing, hearing, and speaking;

27

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1522(b).

Plaintiff bears the burden of showing severity at the second step of the SEP.  See Hunter, 993 F.2d at 35 ("Through the fourth step, the burden of production and proof is on the claimant."). Unless obviously slight, insignificant, or meaningless, limitation in one of the above-cited areas due to an impairment generally requires recognition of that impairment as severe.  See Martin v. Heckler, 748 F.2d 1027, 1032 (5th Cir. 1984).  Plaintiff, however, must support any showing of severity with relevant medical evidence:

> A claimant's showing at step two that he or she has a severe impairment has been described as "de minimis." Hawkins v. Chater, 113 F.3d 1162, 1169 (10th Cir. 1997); see Williams v. Bowen, 844 F.2d 748, 751 (10th Cir. 1988)("de minimis showing of medical severity").  A claimant need only be able to show at this level that the impairment would have more than a minimal effect on his or her ability to do basic work activities.  Williams, 844 F.2d at 751.  However, the claimant must show more than the mere presence of a condition or ailment.  If the medical severity of a claimant's impairments is so slight that the impairments could not interfere with or have a serious impact on the claimant's ability to do basic work activities, the impairments do not prevent the claimant from engaging in substantial work activity.  Thus, at step two, the ALJ looks at the claimant's impairment or combination of impairments only and determines the impact

28

> the impairment would have on his or her ability to work. Hinkle v. Apfel, 132 F.3d 1349, 1352 (10th Cir. 1997).
>
> The determination at step two is based on medical factors alone. Williamson v. Barnhart, 350 F.3d 1097, 1100 (10th Cir. 2003). A claimant must provide medical evidence that he or she had an impairment and how severe it was during the time the claimant alleges they were disabled. 20 C.F.R. § 404.1512(c). The evidence that a claimant has an impairment must come from acceptable medical sources including licensed physicians or psychologists. 20 C.F.R. § 404.1513(a). A claimant's statements regarding the severity of an impairment is [sic] not sufficient. Adame v. Apfel, 2000 WL 422341 at *3-4 (D. Kan. March 20, 2000); Flint v. Sullivan, 743 F. Supp. 777, 782 (D. Kan. 1990).

Rivas v. Barnhart, Civ. No. 05-1266, 2006 WL 4046153, at *4 (D. Kan. Aug. 16, 2006) (unpublished).

Plaintiff fails to meet this burden. No medical evidence of record suggests that Plaintiff's headaches had more than a minimal impact on his ability to perform basic work activities. Plaintiff began experiencing migraine headaches after suffering multiple TBIs while deployed with the Marine Corps. (Tr. 865.) The medical evidence shows that Plaintiff developed chronic post traumatic headache as a result of those injuries, that he experienced them once a month, and that they lasted for one hour. (Tr. 883-85.) However, neurological examination showed that Plaintiff's cranial nerves remained grossly intact aside from "mild loss of nasolabial on left." (Tr. 885.) Plaintiff's treatment plan for this condition included "[E]xcedrine [M]igraine as needed." (Tr. 884.) Plaintiff indicated that this treatment yielded "okay results."

29

(Tr. 853.)  Furthermore, although the VA assigned Plaintiff a 30 percent disability rating due to his headaches (Tr. 310), elsewhere in the record a VA physician, Dr. Foluke Akinyemi, observed that Plaintiff did not have "characteristic prostrating attacks of migraine/non-migraine headache pain," and that his headache condition did <u>not</u> impact his ability to work (Tr. 885).

Plaintiff suffered another TBI in 2013, when another vehicle struck his motorcycle.  (<u>See, e.g.,</u> Tr. 445.)  According to Plaintiff, his headaches worsened after that incident. (<u>See</u> Docket Entry 9 at 8 (citing Tr. 865-66).)  A close inspection of the record contradicts that assertion.  Plaintiff relies on one portion of a Disability Benefits Questionnaire completed at the VA on August 31, 2016, evaluating each of the impairments that factored into the VA's disability determination.  (Tr. 861-946.)  The cited portion constitutes an evaluation of Plaintiff's TBIs "or any residuals of a TBI."  (Tr. 864.)  The medical provider completing the form classified Plaintiff's headaches as "[o]ther diagnosed residuals attributable to TBI," more specifically as "[TBI] with residual [c]hronic traumatic headache."  (<u>Id.</u>)  Plaintiff's "[r]esidual TBI [s]ymptoms" consisted of "impaired memory, concentration and attention, headaches, behavioral issues such as anger and emotional liability."  (Tr. 865.)  Plaintiff stated generally that these symptoms had worsened.  (<u>Id.</u>)  However, in another section of the questionnaire evaluating only Plaintiff's

30

chronic post-traumatic headaches, he denied that his headaches had changed since his 2013 TBI. (Tr. 883-84). In other words, Plaintiff stated that his headaches remained the same after his motorcycle accident. In keeping with that statement, Plaintiff's headaches did not prevent him from engaging in work at the medium exertional level as a police officer from early 2013 to late 2014. (See Tr. 85, 336.)

Alternatively, even if the ALJ erred by failing to identify Plaintiff's headaches as a severe impairment, this error would not warrant remand. Where an ALJ has already determined that a plaintiff suffers from at least one severe impairment, any failure to categorize an additional impairment as severe generally cannot constitute reversible error, because, "upon determining that a claimant has one severe impairment, the [analysis] must continue with the remaining steps in [the] disability evaluation." Maziarz v. Secretary of Health & Human Servs., 837 F.2d 240, 244 (6th Cir. 1987); accord Oldham v. Astrue, 509 F.3d 1254, 1256-57 (10th Cir. 2007); Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007); Lauver v. Astrue, No. 2:08CV87, 2010 WL 1404767, at *4 (N.D.W. Va. Mar. 31, 2010) (unpublished); Washington v. Astrue, 698 F. Supp. 2d 562, 579 (D.S.C. 2010); Jones v. Astrue, No. 5:07CV452FL, 2009 WL 455414, at *2 (E.D.N.C. Feb. 23, 2009) (unpublished). In this case, the ALJ found five severe impairments and proceeded with the SEP. (Tr. 26-34.) As discussed in more detail below, the ALJ's

31

RFC assessment sufficiently encompassed Plaintiff's limitations from his headaches. Under such circumstances, any alleged improper application of law at step two caused Plaintiff no prejudice. <u>See</u> <u>Oldham</u>, 509 F.3d at 1256-57; <u>Lewis</u>, 498 F.3d at 911; <u>Maziarz</u>, 837 F.2d at 244; <u>Lauver</u>, 2010 WL 1404767, at *4; <u>Washington</u>, 698 F. Supp. 2d at 579-80; <u>Jones</u>, 2009 WL 455414, at *2.

After conceding that Plaintiff's "headaches are not in themselves disabling under Social Security law" (Docket Entry 9 at 9), Plaintiff argues that "the ALJ's failure to even mention them violates the basic requirement that the ALJ account for all significant non-exertional impairments in the RFC" (<u>id.</u>). This argument fails because the record establishes that Plaintiff's headaches represented a symptom or complication of his TBI, which the ALJ did identify as a severe impairment (<u>see</u> Tr. 26) and for which the ALJ made numerous accommodations in formulating Plaintiff's RFC (<u>see</u> Tr. 28-29). To begin, the VA Disability Benefits Questionnaire classifies Plaintiff's headaches at several points as a residual effect of his TBIs. (<u>See, e.g.</u>, Tr. 884 ("[t]he Veteran is service connected for [TBI] with residual post[-]traumatic headaches).) In another section, the Questionnaire lists Plaintiff's headaches as a subjective symptom of his TBI. (Tr. 866-67.) Further, the record shows that the ALJ added multiple limitations to Plaintiff's RFC based on mental impairments, such as TBI, including the following:

32

- "simple, routine, and repetitive tasks, in a low-stress job (defined as having no more than occasional decision-making required and no more than occasional changes in the work setting)" (Tr. 29);

- "no production rate or paced work (such as would be done on an assembly line)" (id.);

- "no interaction with the general public" (id.);

- "no more than occasional interaction with coworkers, . . . further limited to superficial interaction (such as a brief greeting or a brief exchange of information) and/or interaction that was incidental to the work being performed" (id.); and

- "no tandem tasks" (id.).

Additionally, Plaintiff made no effort to explain what additional limitations the ALJ should have included on account of Plaintiff's headaches, beyond the significant limitations already contained in the RFC. That failure precludes relief. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[A] litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." (internal quotation marks omitted)); Hughes v. B/E Aerospace, Inc., No. 1:12CV717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) (unpublished) ("A party should not expect a court to do the work that it elected not to do."); Nickelson v. Astrue, No. 1:07CV783, 2009 WL 2243626, at *2 n.1 (M.D.N.C. July 27, 2009) (unpublished) ("[A]s [the plaintiff] failed to develop these arguments in his [b]rief, the

33

[C]ourt will not address them."), <u>recommendation adopted</u>, slip op. (M.D.N.C. Sept. 21, 2009).

In sum, the ALJ properly evaluated Plaintiff's headaches at steps two and five.

### 4. Evaluation of Plaintiff's Subjective Reports of Pain

In Plaintiff's fourth and final issue on review, he maintains that "[t]he ALJ erred by his selective use of evidence regarding [Plaintiff's] pain." (Docket Entry 9 at 9 (italics and single-spacing omitted).)[9] In particular, Plaintiff contends that "the medical record convincingly established that [Plaintiff] actually had the pain alleged" (<u>id.</u> at 9-10 (detailing such alleged evidence)), but that "[t]he ALJ . . . failed to consider a lot of th[at] evidence, . . . [and] stated that [Plaintiff] 'often denied any significant pain'" (<u>id.</u> at 10 (quoting Tr. 30)). According to Plaintiff, "the fact that [he] sometimes acknowledged to physicians that he felt no pain *on that particular day* merely shows he was truthful." (<u>Id.</u> at 10-11 (emphasis in original).) Plaintiff posits that, "[h]ad the ALJ considered *all* of the evidence regarding pain, he probably would not have denied [Plaintiff's]

_____

[9] Although Plaintiff's Brief also asserts in conclusory fashion that "[t]he ALJ erred . . . by failing to account for the effect of [Plaintiff's] pain on his ability to concentrate and maintain attention; and by failing to account for all of [Plaintiff's] impairments in the RFC" (Docket Entry 9 at 9 (italics and single-spacing omitted)), Plaintiff's Brief does not further develop any such arguments in the body of his fourth assignment of error (<u>see</u> <u>id.</u> at 9-12). Accordingly, Plaintiff has waived those arguments on judicial review. <u>See</u> <u>Zannino</u>, 895 F.2d at 17; <u>Hughes</u>, 2014 WL 906220, at *1 n.1; <u>Nickelson</u>, 2009 WL 2243626, at *2 n.1.

34

case at [the second part of the pain analysis under 20 C.F.R. § 404.1529].” (<u>Id.</u> at 12 (emphasis in original).)

Social Security Ruling 16-3p, <u>Titles II and XVI: Evaluation of Symptoms in Disability Claims</u>, 2017 WL 5180304, at *5 (Oct. 25, 2017) (“SSR 16-3p”) (consistent with the Commissioner’s regulations) adopts a two-part test for evaluating a claimant’s statements about symptoms. <u>See</u> SSR 16-3p, 2017 WL 5180304, at *3; <u>see also</u> 20 C.F.R. § 404.1529.[10]  First, the ALJ “must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual’s symptoms, such as pain.”  SSR 16-3p, 2017 WL 5180304, at *3.  A claimant must provide “objective medical evidence from an acceptable medical source to establish the existence of a medically determinable impairment that could reasonably be expected to produce [the] alleged symptoms.”  <u>Id.</u> Objective medical evidence consists of medical signs (“anatomical, physiological, or psychological abnormalities established by

_____

[10] Applicable to ALJ decisions on or after March 28, 2016, the Social Security Administration superceded Social Security Ruling 96-7p, <u>Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims</u>, 1996 WL 374186 (July 2, 1996) (“SSR 96-7p”), with SSR 16-3p.  The new ruling “eliminat[es] the use of the term ‘credibility’ from . . . sub-regulatory policy, as [the] regulations do not use this term.”  SSR 16-3p, 2017 WL 5180304, at *1.  The ruling “clarif[ies] that subjective symptom evaluation is not an examination of the individual’s character,” <u>id.</u>, and “offer[s] additional guidance to [ALJs] on regulatory implementation problems that have been identified since [the publishing of] SSR 96-7p,” <u>id.</u> at *1 n.1.  The ALJ’s decision in this case postdates the effective date of SSR 16-3p (<u>see</u> Tr. 35) and, thus, this Recommendation will apply SSR 16-3p to Plaintiff’s argument regarding the ALJ’s subjective symptom evaluation.

35

medically acceptable clinical diagnostic techniques") and laboratory findings "shown by the use of medically acceptable laboratory diagnostic techniques." Id.

Upon satisfaction of part one by the claimant, the analysis proceeds to part two, which requires an assessment of the intensity and persistence of the claimant's symptoms, as well as the extent to which those symptoms affect his or her ability to work. See id. at *4. In making that determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." Id. Where relevant, the ALJ will also consider the following factors in assessing the extent of the claimant's symptoms at part two:

1. Daily activities;

2. The location, duration, frequency, and intensity of pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g.,

36

lying flat on his or her back, standing for 15 to 20
minutes every hour, or sleeping on a board); and

7. Any other factors concerning an individual's
functional limitations and restrictions due to pain or
other symptoms.

Id. at *7-8. The ALJ cannot "disregard an individual's statements
about the intensity, persistence, and limiting effects of symptoms
solely because the objective medical evidence does not substantiate
the degree of impairment-related symptoms alleged by the
individual." Id. at *5 (emphasis added). When evaluating a
claimant's subjective complaints about their symptoms, however, the
ALJ need not take those complaints "'at face value.'" Squires v.
Colvin, No. 1:16CV190, 2017 WL 354271, at *5 (M.D.N.C. Jan. 24,
2017) (unpublished) (quoting Ramos-Rodriguez v. Commissioner of
Soc. Sec., Civ. No. 11-1323 (SEC), 2012 WL 2120027, at *3 (D.P.R.
June 11, 2012) (unpublished)), recommendation adopted, slip op.
(M.D.N.C. Mar. 6, 2017) (Schroeder, J.).

Here, the ALJ expressly discussed Plaintiff's testimony that
he "ha[d] constant pain throughout" his left arm, that "neck pain
[] prevented him from turning it quickly," and that his "back and
ankle pain [] limited physical activity." (Tr. 30.) The ALJ also
discussed Plaintiff's statements that "he ha[d] to lie down during
the day for up to 6 hours due to pain," and that he had undergone
"surgeries[ and] physical therapy, and used medication for pain[]
but . . . that nothing provided permanent relief." (Id.) "After

37

careful consideration of th[at] evidence, [the ALJ found that, although Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms . . ., [his] statements concerning the intensity, persistence and limiting effects of th[o]se symptoms [we]re not entirely/reasonably/ sufficiently consistent with the record as a whole (to establish disability)." (Tr. 29.)  Significantly, the ALJ noted that he nonetheless gave Plaintiff's subjective pain complaints the benefit of the doubt by "includ[ing] numerous limitations in the [RFC] . . . out of an abundance of caution – to try to ensure that any job found by the VE would (more than) accommodate [Plaintiff's] limitations." (Id.)

Moreover, the ALJ sufficiently explained and supported his decision to discount Plaintiff's subjective reports of pain.  In that regard, the ALJ outlined Plaintiff's relevant medical history, including mild to moderate diagnostic findings and improvement on medication, as follows:

- examination findings showed "no signs of acute distress; normal anterior cervical chain with full neck motion; no signs of . . . edema; full right upper extremity and bilateral lower extremity motion and strength; [] well-healed surgical scars[,] . . . grossly intact cranial nerves; intact bilateral lower extremity and right upper extremity reflexes; normal gait and balance with intact tandem and heel-to-toe walking; [] negative Romberg signs[,] . . . no difficulty walking, getting on/off examination tables, taking shoes on/off; nor writing or signing medical documents" (Tr. 30);

38

- "with medication use and left arm bracing alone, [Plaintiff] often denied any significant pain" (id.);

- Plaintiff's "course of treatment remained steady through July 2017" (id.); and

- "recent treatment records for physical impairments [we]re relatively sparse" (id.).

The ALJ also noted that Plaintiff's daily activities included repairing his home (see Tr. 31), "shopping" (Tr. 27), going out "to dinner alone and with others" (Tr. 27-28), "visit[ing] friends and family in Texas (Tr. 28)," "driv[ing] a motor vehicle, watch[ing] television and listen[ing] to music, read[ing] books, manag[ing] his own funds, and us[ing] the internet" (id.).

Given this record, Plaintiff's contention that "[t]he ALJ erred by his selective use of evidence regarding [Plaintiff's] pain" misses the mark. (Docket Entry 9 at 9 (emphasis added and italics and single-spacing omitted)). Although Plaintiff provides examples of record evidence that he believes support his allegations of disabling pain (see id. at 10-12 (citing Tr. 56, 591, 593, 619, 631, 645, 646, 663, 674, 745, 796, 808, 819-20, 827, 850, 851, 853, 854, 877)), Plaintiff misinterprets this Court's standard of review. The Court must determine whether the ALJ supported his analysis of Plaintiff's subjective reports of pain with substantial evidence, defined as "more than a mere scintilla of evidence but . . . somewhat less than a preponderance," Mastro,

39

270 F.3d at 176 (brackets and internal quotation marks omitted), and not whether other record evidence weighs against the ALJ's analysis, <u>Lanier v. Colvin</u>, No. CV414-004, 2015 WL 3622619, at *1 (S.D. Ga. June 9, 2015) (unpublished) ("The fact that [the p]laintiff disagrees with the ALJ's decision, or that there is other evidence in the record that weighs against the ALJ's decision, does not mean that the decision is unsupported by substantial evidence.").

Lastly, Plaintiff faults the ALJ for finding that Plaintiff "'often denied any significant pain.'" (Docket Entry 9 at 10 (quoting Tr. 30).) According to Plaintiff, "the fact that [he] sometimes acknowledged to physicians that he felt no pain *on that particular day* merely shows he was truthful." (<u>Id.</u> at 10-11 (emphasis in original).) However, "truthful[ness]" no longer represents the proper inquiry in analyzing a claimant's subjective complaints. <u>See</u> SSR 16-3p, 2017 WL 5180304, at *1 ("clarify[ing] that subjective symptom evaluation is not an examination of the individual's character"); <u>see also</u> <u>id.</u> at *11 ("[ALJs] will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person.") Rather, the ALJ must examine the <u>consistency</u> of Plaintiff's statements regarding the intensity, persistence, and limiting effects of his

40

pain with the record as a whole, see id. at *2, and thus the fact that Plaintiff denied significant pain on several occasions remains inconsistent with his complaints of disabling pain throughout the relevant period.

Under these circumstances, Plaintiff's fourth assignment of error fails as a matter of law.

### III. CONCLUSION

Plaintiff has not established grounds for relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 8) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 10) be granted, and that judgment be entered dismissing this action.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

March 6, 2020